IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMMIE YERKS,

                          Plaintiff,

    v.

SANDRA MCARDLE,
MAXIM PHYSICIAN RESOURCES,
JOLINDA WATERMAN, LORI ASLUM,
DR. EILEEN GAVIN, and
WELLHART, LLC,

                      Defendants.

OPINION AND ORDER

19-cv-595-wmc

---

*Pro se* plaintiff Jammie Yerks filed this lawsuit under 42 U.S.C. § 1983, alleging that defendants were deliberately indifferent and negligent in delaying the renewal of his Tramadol prescription by three months. Before the court are defendants' motions for summary judgment (dkt. ##65, 71, 80), which the court will grant for lack of sufficient evidence to support a jury finding of deliberate indifference in violation of plaintiff's Eighth Amendment rights. That is a much higher standard than the more arguably negligent failures by some of the individual defendants, and the Wisconsin Department of Corrections ("DOC") more generally to ensure a continuity of care, especially with respect to the continuation of prescription medication as an inmate is moved from one institution to another. In light of this ruling, the court will also decline to exercise supplemental jurisdiction over plaintiff's remaining state law negligence claims, which he may pursue in state court subject to any applicable Wisconsin statute of limitations.

UNDISPUTED FACTS[1]

The events underlying this lawsuit took place in late 2018 and early 2019 while plaintiff Yerks was incarcerated at the Wisconsin Secure Program Facility ("WSPF"). Certain defendants were working there at the time, including Health Services Unit ("HSU") Manager Jolinda Waterman, Dr. Eileen Gavin, and Nurse Practitioner Sandra McArdle. Waterman was employed by the DOC until her retirement in May 2019, while Gavin and McArdle were at WSPF on placement contracts through defendants Wellhart, LLC, and Maxim Physician Resources, respectively. Defendant Lori Alsum was the DOC's Health Services Nursing Coordinator and a Reviewing Authority for the Bureau of Health Services ("BHS") until her retirement in March 2021.[2]

### A. Plaintiff's Shoulder Injury and Initial Treatment

By way of background, Yerks suffered a torn rotator cuff in his right shoulder in September 2014 while housed at DOC's Dodge Correctional Facility. Yerks was initially prescribed naproxen for his pain, as well as occupational therapy and in-cell exercises, but he declined steroid injections. As Yerks continued with these prescribed medication and

---

[1] The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party. Although plaintiff purports to dispute nearly all of defendants' proposed findings of fact, often stating that the issue would be for a jury to decide, the court has deemed the defendants' proposed findings of fact undisputed where plaintiff has submitted no admissible evidence in dispute. Thus, unless otherwise noted, the following facts are material and undisputed.

[2] In his response brief, plaintiff raises arguments concerning other, proposed defendants that the court denied him leave to proceed against in its screening order. (Dkt. #25.) Specifically, the court dismissed proposed defendants Wisconsin Department of Corrections, Greer, Kallas, Daane, and any John and Jane Doe(s) at screening and will not address Yerks's arguments concerning any of these proposed defendants further. (Id. at 22.)

treatments, his pain waxed and waned.

On July 19, 2016, after developing what he referred to as a "frozen shoulder," Yerks told his doctor that although he was "getting by," he had "trouble sleeping at night." (Dkt. #83-1 at 3.) As a result, Yerks asked if he could have occasional use of something stronger that might help him sleep. In response, the doctor prescribed 25 mg of indomethacin 3 times a day for pain, and 50 mg of Tramadol to be taken at bedtime when his pain worsened, while advising Yerks to use the latter narcotic only 3 or 4 times a week.

At his August 2021 deposition, Yerks testified that he recalled taking Tramadol two or three times a day since it was first prescribed to him. (Dkt. #68-1 at 46:8-48:9.) In contrast, Yerks reported improved sleep after taking Tramadol every *other* night at his follow-up appointment on August 31, 2016. Moreover, based on this assertion, the doctor continued the Tramadol regimen, and Yerks's prescription was renewed continuously through late 2018.

**B. Yerks's Tramadol Prescription is Discontinued**

After Yerks was transferred to WSPF in early October 2018, he reported aggravating his shoulder injury and told the HSU that he was in severe pain. (Dkt. #6-1 at 28.) An MRI performed on December 5 indicated a chronic-appearing, full-thickness rotator cuff tear. (*Id.* at 35.) On December 16, Yerks also submitted a renewal request for Tramadol. Three days later, Nurse Practitioner McArdle then completed a prescribed order for the Tramadol. (Dkt. #83-1 at 6.)

However, that same day, December 19, a nondefendant nurse noted in response to Yerks's request for Tramadol that it had been discontinued. (*See* dkt. ##77-1 at 25-26,

3

83-1 at 8.)  The record does not reveal why Yerks's prescription was discontinued, but there is no dispute that defendant McArdle, as a nurse practitioner, did not process medication renewal requests beyond submitting them to be filled, and did not routinely fill prescriptions, or follow up on prescription requests.  Nor is there any dispute that Yerks stopped receiving Tramadol on December 19, 2018.  Later, on December 26, HSU Manager Waterman saw Yerks for a sick call to check his blood pressure, and specifically noted that Yerks did not appear to her to be in acute pain.  Moreover, two weeks later, in a January 2, 2019, patient letter to Yerks, defendant McArdle suggests that there was an error at the pharmacy.  (Dkt. #77-1 at 21.)  Regardless, McArdle attests that by the time she received a health services request ("HSR") from Yerks alerting her to the issue:  (1) he had been off the Tramadol for about two weeks, and (2) any prescription renewal for Tramadol would have to be reapproved by the Class III Committee, which determines whether certain proposed prescriptions and treatments are medically necessary.  (Dkt. #83 at 4-5.)

Yerks also admitted at his deposition that he never personally told Waterman that he had not been receiving Tramadol.  (Dkt. #68-1 at 97:12-16.)  Instead, on December 30, 2018, Nurse Practitioner McArdle appears to have received an HSR from Yerks, indicating for the first time that:  (1) he had gone without Tramadol since December 19; (2) he was in pain and could not sleep; and (3) he had already written "several times" about the problem, but "no one [had] answered" him.  (Dkt. #83-1 at 7.)

An HSR is generally how inmates communicate their medical concerns to HSU staff.  These requests are collected daily from the housing units and triaged by nursing

staff, typically within 24 hours of receipt.  Nursing staff may also forward an HSR to an advanced care provider to address a particular issue.  Having reviewed Yerks's HSR, McArdle responded in a January 2, 2019, patient letter to Yerks that she had investigated the issue and received contradictory information.  McArdle explained that when she called DOC Central Pharmacy the week before, she was told that Yerks still had Tramadol.  Rather than rely solely on pharmacy records, however, McArdle also reported speaking with the HSU nurses who stated that Yerks had run out of his medication on December 19, but that the nurses "had not heard from" Yerks since.  (Dkt. #77-1 at 21.)  McArdle concluded by explaining that because Yerks had now been off the medication for a "prolonged period of time," it would be "difficult for [McArdle] to get permission for ongoing use."  (*Id.*)

To that end, McArdle attests she asked that Yerks be scheduled for an evaluation so that his medications, current level of functioning, and medical record could be further reviewed.  (Dkt. #83 at 4-5.)  McArdle further attests that providers have "significantly reduced the volume of narcotic medication being prescribed to treat chronic pain," and that Tramadol "should be used sparingly and avoided when possible."  (*Id.* at 6.)  Although McArdle could not immediately fill Yerks's prescription for Tramadol, she did confirm his prescription for Trazadone, an antidepressant commonly prescribed to treat pain and to help with sleep, and acetaminophen, an over-the-counter pain medication.  (Dkt. ##83 at 5, 83-1 at 9.)  Moreover, at his deposition, Yerks acknowledged that he was taking Trazadone at that time for anxiety, depression and to help him sleep.  Still, Yerks testified that although acetaminophen may have also been listed on his HSU chart, he would not

have taken it because of the "stomach issues" it causes him.  (Dkt. #68-1 at 38:4-40:8, 42:1-7.)

A nurse also confirmed to Yerks that he was scheduled to be seen by a provider in response to the HSRs he submitted on January 2 and January 8, 2019, which had asked about his pain medication.  (Dkt. #77-1 at 27-28.)  While waiting for his appointment with a doctor, Yerks further had a "file review" in the HSU on January 9, 2019.  Afterward, Yerks attests that he saw McArdle standing outside her office in the HSU and told her that he was still in pain and without Tramadol, but she explained there was nothing more she could do at that time and to submit another HSR.  (Dkt. #105 at 8.)  Although McArdle does not recall this specific conversation, she attests to never witnessing Yerks "in any acute distress such that he would need immediate medical attention," and in any event she would not have been able to provide Yerks with Tramadol at that point without Class III Committee approval even if they did speak that day about the issue.  (Dkt. #83 at 6.)

However, Yerks alleges that he *was* complaining verbally to security and HSU staff about his pain, and his behavioral log documents those complaints about pain medication to security staff beginning in 2019.  Specifically, on January 6 and 28, and again on February 8 and 18, 2019, his behavioral log indicates that Yerks complained, although it does not indicate whether or not staff ever informed any of the named defendants of these ongoing complaints.  (Dkt. #6-1 at 49.)

## C.   Dr. Gavin's Treatment

Yerks next medical visit was on January 17, 2019, with Dr. Gavin, who had over 20 years of experience as a family medicine physician.  Although initially scheduled for an

appointment on January 14, "unit activity" required rescheduling. (Dkt. #78-1 at 17.) As a new patient for Dr. Gavin, Yerks disclosed his rotator cuff tear, as well as indicated that he had limited range of motion, and was having a very difficult time sleeping due to shoulder pain. Yerks also explained that he had recently undergone a follow-up MRI confirming his chronic rotator cuff tear injury, and that except for the last several weeks, he had previously been on Tramadol for more than two years, which had helped him manage his pain and sleep better.

As a general matter, Dr. Gavin attests that medical care providers are now reluctant to prescribe Tramadol for chronic musculoskeletal pain conditions, and providers who work in the correctional care setting "must be aware of and keep in consideration security concerns, facility resources, and potential secondary gain issues with incarcerated individuals." (Dkt. #67 at 2.) Thus, Dr. Gavin conducted a physical exam of Yerks, documenting in her progress notes that he seemed alert and not in acute distress, at least at that time. The doctor further observed that Yerks appeared to have some atrophy in his shoulder, causing her to believe that his rotator cuff injury would likely not be responsive to surgical options. Although she could not find the most recent MRI in Yerks's records -- likely because WSPF was switching from paper to electronic records at that time -- Dr. Gavin notes indicate her intent to request a copy of the MRI to review and confirm the extent of Yerks's injury. After observing a significant spasm in Yerks's right trapezius muscle, Dr. Gavin also surmised that Yerks might benefit from a muscle relaxant even more than renewing his Tramadol, and thus, she prescribed cyclobenzaprine, which Yerks could start immediately because it was not subject to Class III Committee approval. Dr. Gavin

also attests that cyclobenzaprine is often prescribed for orthopedic injuries to provide pain relief and to help with sleep.  Finally, Dr. Gavin advised Yerks if that medication did not prove effective, then he could go back on Tramadol, and she would see him for a follow-up visit in a few weeks.

That follow-up occurred on February 18, 2019, at which time Dr. Gavin addressed the MRI results and the cyclobenzaprine.  First, she reviewed the most recent MRI results with Yerks, who again appeared to the doctor to be alert and in no acute distress or urgent pain.  Because the MRI results confirmed a significant shoulder injury, Dr. Gavin told Yerks that she would present his case to the Class III Committee for review of his past Tramadol prescription and would recommend that the dosage be increased given his size, as well as the fact that he had been taking the narcotic for about two years before his prescription was cancelled.  Dr. Gavin filled out an authorization for chronic opioid use that same day, and she further advised Yerks that she would present his case to the committee the following week.  Although Dr. Gavin attests that this was indeed her intention at the time, she ended up being unable to present Yerks's case until the March 2019 meeting.  (Dkt. #67 at 6.)  At this point, the doctor does not recall *why* she was unable to present Yerks's case in February as planned, but she notes that:  committee meetings were sometimes postponed; or she may have been mistaken about the February meeting date when originally speaking with Yerks; or sometimes she was unable to participate in a monthly meeting due to her other clinical responsibilities or her patient schedule.  (*Id.*)

As for the cyclobenzaprine, Yerks told Dr. Gavin during the February appointment

that he had never received that medication either.  Before that appointment, Yerks had sent an HSR on February 11 about his missing medication, referencing both Tramadol *and* cyclobenzaprine.  The next day, a nurse responded that the request had been "forwarded to [the] prescriber."  (Dkt. #77-1 at 24.)  As a result, Dr. Gavin attests that she was not aware of any remaining issue until Yerks himself reported it to her at his February 18th follow-up appointment.  (Dkt. #67 at 5.)  Moreover, the record shows that once so advised, Gavin promptly reviewed Yerks's medication administration record and spoke with nursing staff that same day to confirm what he had reported.  Dr. Gavin then personally checked with the pharmacy to see if the medication was available, and re-prescribed it for Yerks with an initial dose scheduled for that same evening.   Yerks began receiving cyclobenzaprine on February 18, 2019, which he attests provided "[s]ome help, but not much" in soothing his shoulder pain.  (Dkt. #68-1 at 78:19-25.)

Yerks next saw Dr. Gavin about a month later, on March 13, 2019, the same day she had presented his case for Tramadol to the Class III Committee.  Although Yerks's primary concerns at that appointment were acid reflux and eczema, Dr. Gavin also discussed his Tramadol prescription.  Dr. Gavin explained to Yerks that she had requested a variable 50-100 mg dose, twice a day, so that he could decide what dose to take based on his level of pain at the time, as well as that the committee had approved his re-prescription as requested.  Dr. Gavin also entered the order for Tramadol that same day, with an initial dose starting the following morning.   Since then, Yerks has received Tramadol as prescribed.

### D.   Yerks's Inmate Complaints and Letters

During this three-month delay in restarting his Tramadol prescription, Yerks filed inmate complaints and wrote letters to administrative staff including defendants Waterman as the HSU Manager at WSPF and Alsum as DOC's Health Services Nursing Coordinator.  Relevant here, HSU Manager Waterman did not generally provide direct medical care to inmates, nor did she issue prescriptions.  Waterman also did not triage HSRs; typically, she would not even see them, regardless of their being addressed to her, unless nursing staff forwarded a request to her because of a particular issue within her wheelhouse.  Similarly, as a reviewing authority and nursing coordinator for the BHS, Alsum also did not typically provide direct medical care to inmates, but would investigate inmate complaints assigned to her and recommend decisions based on her review.

As for Yerks's specific complaints, he filed inmate complaint WSPF-2019-53 on December 30, 2018, alleging that he had not received Tramadol since December 19.  When the inmate complaint examiner ("ICE") contacted HSU Manager Waterman as part of that investigation, Waterman then reviewed Yerks's medical records, noting that Yerks had been seen by Dr. Gavin on January 17.  On January 18, 2019, the ICE then recommended affirming Yerks's complaint to acknowledge that his Tramadol prescription had expired, and that there had been a delay in his seeing a provider for possible renewal.  However, the ICE also noted that Yerks had just seen Dr. Gavin the day before, who as previously discussed, had prescribed cyclobenzaprine, advised that Yerks could resume Tramadol (if cyclobenzaprine proved ineffective as a pain treatment), and committed to following up with Yerks.  (Dkt. #78-1 at 2-3.)  Alsum next served as the reviewing authority, and that

10

very same day affirmed Yerks's complaint due to the unfortunate delay, while also noting that Dr. Gavin had a plan of care in place going forward.  (*Id.* at 4.)  Similarly, Waterman was copied on Alsum's decision.

Two days later, on January 20, 2019, Yerks sent a follow-up HSR addressed to Waterman as the HSU Manager, noting that he was still without his "pain medication" and could not sleep from pain.  (Dkt. #77-1 at 22.)  However, that HSR does not mention Dr. Gavin or cyclobenzaprine.  Even so, a nurse responded to his HSR the next day, referring it to an advanced care provider rather than Waterman and noting that he was scheduled for a doctor's appointment.

Also on January 20, Yerks sent three, separate-but-identical letters to the DOC's Director, Medical Director, and Pharmacy Director at the BHS regarding his shoulder condition and pain management.   These letters, which also did not mention cyclobenzaprine or Dr. Gavin, were then forwarded to Alsum to prepare a response on behalf of the BHS.  Alsum responded on February 4, noting that each letter raised the same issue just reviewed in response to Yerks's inmate complaint and concluding that no further intervention was required because:  (1) he had seen a doctor only three days before; and (2) that doctor had implemented a plan of care, which included trying cyclobenzaprine.  (Dkt. #79-3.)   Accordingly, Alsum encouraged Yerks to submit an HSR if he needed further intervention, explaining why using the formal grievance procedure was preferable to his just writing letters.  Alsum also sent copies of Yerks's letters and her response to HSU Manager Waterman, who recalls receiving both, reviewing the materials, and concluding that no further intervention was necessary at that time in light of Dr. Gavin's

11

recent actions.  (Dkt. #75 at 6, 8.)

On February 11, 2019, Yerks sent a letter to Alsum noting that he had not yet received cyclobenzaprine "or any other Medication as of yet," supposedly despite writing to the HSU repeatedly.  (Dkt. #77-2.)  Alsum attests that she does not remember ever receiving this letter, and no copy of the letter was found during a DOC search of Alsum's network drives, electronic files, hard copy files of correspondence, or her correspondence in Sharepoint, which is a web-based platform where all BHS correspondence is uploaded and assigned for a response.  (Dkt. #74 at 6.)  Nor is the letter stamped as received.  (Dkt. #77-2.)  Further, Yerks does not specify when or how he sent the letter, and he acknowledges having no evidence that Alsum ever received it.  (Dkt. #115 at 20.)

Finally, on February 11 and 18, Yerks again sent HSRs stating that he had not yet received Tramadol or cyclobenzaprine.  Nursing staff triaged both of these requests as well, noting:  in their February 12 response to the former HSR, that there was not yet an order for cyclobenzaprine and that Yerks's concerns would be "forwarded to the prescriber"; and in their February 18 response to the latter HSR, that Yerks was scheduled to be seen in the HSU soon.  (Dkt. #77-1 at 24, 125.)  Neither of these HSRs indicates that it was forwarded to Waterman, and as indicated above, Yerks was indeed seen by Dr. Gavin on February 18, and began receiving cyclobenzaprine that same day.

## OPINION

A moving party is entitled to summary judgment if it can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving

party must produce evidence that would permit a jury to reasonably find for the non-moving party to survive this motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a summary judgment motion, a court views disputed facts in a light most favorable to the non-moving party. However, the court does not need to draw inferences only supported by speculation or conjecture in the non-moving party's favor. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

Defendants seek judgment on all of plaintiff's claims of deliberately indifference and negligence based on delays in the renewal of his Tramadol prescription, which left him to suffer needlessly in pain for three months. As for plaintiff's claims of deliberate indifference, the court is sympathetic to plaintiff's apparent needless suffering due to defendants' negligence (or even gross negligence) but the Supreme Court and the Seventh Circuit have made it abundantly clear that this conduct alone does not constitute a federal constitutional violation, and unfortunately for plaintiff, he has been unable to marshal sufficient evidence for a reasonable jury to find any of the defendant's actions (or lack of action) amounted to the higher standard of deliberate indifference in violation of the Eighth and Fourteenth Amendments.[3] As for plaintiff's remaining state law claims of negligence against defendants Wellhart and Maxim, and their respective independent contractors, Gavin and McArdle, the court will dismiss them without prejudice for lack of

---

[3] Defendants Waterman and Alsum alternatively assert that they are entitled to qualified immunity. (Dkt. #72 at 14-16.) However, their one-sentence argument in support is that there is "no precedent clearly establishing a right to have healthcare administrators intervene in these circumstances to ensure [plaintiff] received a pain medication as prescribed by his treatment provider." (*Id.* at 16.) Because this proposition ultimately turns on the merits, and as explained below, the merits favor these two defendants, the court will not address their alternative qualified immunity defense.

an independent basis of federal jurisdiction.

## I. Deliberate Indifference

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two things: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical need is serious if: it so obviously requires treatment that even a lay person could recognize the need for medical attention; it carries risk of permanent serious impairment if left untreated; it results in needless pain and suffering; or it significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997).

For purposes of summary judgment at least, the parties do not dispute that plaintiff suffered from a serious medical need based on his MRI showing a chronic rotator cuff tear and ongoing complaints of pain. Instead, defendants seek summary judgment based on a lack of evidence that they were deliberately indifferent to that need. Proof of deliberate indifference must meet a high standard, requiring subjective evidence the defendant *both* (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* (2) also drew "the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Thus, deliberate indifference constitutes more than negligent acts, or even grossly negligent acts, but requires something less than purposeful acts. *Id.* at 836. Moreover, the

14

plaintiff meets the threshold proof of deliberate indifference where evidence allows a reasonable jury to find:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid that risk.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance");  *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").  In particular, a jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).  Accordingly, the court must look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

## A.  DOC's Health Services Nursing Coordinator Lori Alsum

Plaintiff argues that a reasonable jury could find defendant Lori Alsum acted with deliberate indifference to his medical needs by:  (1) advising him in a February 4, 2019, letter to file an inmate complaint when she knew he had already done so; and (2) not responding to his follow-up February 11, 2019, letter advising that he was in still in pain

and without even cyclobenzaprine.  As for plaintiff's first contention, defendant Alsum was merely addressing the importance of using the formal grievance process, as opposed to sending informal letters, while also acknowledging his recent inmate complaints about pain medication.  Regardless, Alsum did not ignore the concerns raised in plaintiff's letters to BHS officials.  Rather, in addition to advising plaintiff to file an HSR if he wanted further evaluation *and* sharing her response with the local HSU Manager Waterman, the record reflects that Alsum reviewed plaintiff's medical records, and even noted in her February 4 response to Yerks that (1) he had seen Dr. Gavin only a few days before, (2) a treatment plan was now in place that included an alternative pain medication, and (3) he had been scheduled for a follow-up visit.

In light of this record, Alsum had every reason to conclude that Yerks had no ongoing, unaddressed issues.  Indeed, Alsum was not typically involved in treating inmates at all, meaning she was entitled to defer to the decisions of plaintiff's treating physician, so long as she had no basis to believe they were ignoring plaintiff's condition.  *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on a doctor's advice unless it will obviously harm the patient); *Rasho v. Elyea*, 856 F.3d 469, 478-79 (7th Cir. 2017) (prison officials, even medical professionals in a non-treating role, are "entitled to rely on the judgment of medical professionals treating an inmate"). Accordingly, no reasonable jury could find that Alsum acted with deliberate indifference on this record, especially after she investigated the matter, verified that plaintiff had a plan of care in place, gave plaintiff guidance on how to proceed if he required further evaluation, *and* as an additional check, shared her response with the HSU Manager at WSPF.

16

As for plaintiff's follow-up letter specifically addressed to Alsum, the question is arguably a closer one, since "an inmate's letters to prison administrators may establish a basis for § 1983 liability." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). However, there is no "ironclad rule that any prisoner communication to a prison official anywhere in the corrections hierarchy" would be sufficient notice of a constitutional violation. *Id*.; *see also Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (a plaintiff's view that every prison official who is aware of a problem must pay damages "can't be right"). Here, Alsum was not only a reviewing authority, but plaintiff's letter was not a formal grievance appealed up through established channels. *See Burks*, 555 F.3d at 595 (noting that "[b]ureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job"); *see also Collins Bey v. Ashworth*, No. 17-cv-784-jdp, 2018 WL 6304352, at *2 (W.D. Wis. Dec. 3, 2018) ("high-level prison officials cannot be held liable for every misdeed in the prison system based solely on receiving a letter from a prisoner").

Moreover, on this record, plaintiff's claim that he sent the letter to Alsum does not by itself create a genuine dispute of material fact regarding her subjective awareness of its contents. Indeed, the DOC could not locate a copy of the letter among any of Alsum's electronic or hard copy files, and the letter itself is not stamped as received. While plaintiff asserts that he sent the letter, which the court accepts for purposes of summary judgment, he admits there is no evidence that anyone at DOC's statewide BHS, much less Alsum, received that letter or read it. *See Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (upholding summary judgment in absence of evidence that supervisor read inmate's complaint letters), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1

(7th Cir. 2013).  The record indicates that inmates' letters are often triaged and referred as appropriate, regardless of the addressed recipient, *and* that when actually assigned a complaint or letter from plaintiff for a response, Alsum *did* investigate, suggesting that she would have similarly responded to plaintiff's subsequent letter had she received it.  Finally, even if Alsum was negligent in failing to track this inmate letter and respond, that is *not* proof of deliberate indifference, but rather carelessness of a busy administrator. Accordingly, she is entitled to summary judgment on plaintiff's Eighth Amendment claim.

**B.  WSPF's HSU Manager Jolinda Waterman**

Turning to defendant Waterman, plaintiff contends that as the HSU Manager, she knew inmates regularly suffered physical injuries, which may require pain management, yet she failed to ensure that her staff had "meaningful access to adequate pain treatment/medication."  (Dkt. #104 at 28.)   Setting aside what generally constitutes "meaningful" access to adequate pain treatment, there is a threshold problem with plaintiff's claim:  he is attempting to move the goalposts at summary judgment.  This court allowed plaintiff to proceed against Waterman based on her alleged *personal* involvement in his medical care.  Specifically, plaintiff claimed that as HSU Manager, Waterman knew plaintiff's concerns regarding pain medication were unresolved and failed to take any reasonable steps in response.  (Dkt. #25 at 9-11.)  To the extent plaintiff is now seeking to assert (or even to arguably revive) a broader claim based on a practice, policy, or custom, that would be highly prejudicial to defendants, including Waterman.  *Cf. Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) (leave to amend a complaint may be denied in the case of "undue prejudice to the opposing party by virtue of allowance of the

amendment").  In any event, plaintiff did *not* allege multiple medication delays because of a policy or practice adopted by Waterman.[4]  *See Grieveson v. Anderson*, 538 F.3d 763, 773-75 (7th Cir. 2008) (four instances of alleged unconstitutional conduct did not constitute widespread practice or custom reflective of a policy choice by the sheriff).

That said, Waterman is entitled to summary judgment on plaintiff's screened claim that she was personally involved in any medication delay or failure to resolve the problem. Instead, the record reflects that Waterman first learned of a problem with plaintiff's Tramadol prescription around January 17, 2019, when an ICE contacted her about plaintiff's December 30, 2018, inmate complaint.  Soon thereafter, Waterman also received copies of plaintiff's January 20, 2019, letters to BHS administrators and Alsum's February 4 response.  Although plaintiff's inmate complaint was affirmed due to well-founded claims of delay, that is not a proxy for a constitutional violation.  Moreover, like Alsum, the evidence indicates that from Waterman's perspective at the time, plaintiff's concerns had just been addressed by Dr. Gavin on January 17, 2019, and a plan of care was in place that included a trial of cyclobenzaprine and a follow-up visit, which Waterman had no reason to think ineffective.  Regardless, that Waterman took no further action at this point cannot be seen by a reasonable jury as deliberate indifference, as opposed to

---

[4] To bolster his assertion that medical care at WSFP was inadequate, plaintiff did file several affirmed inmate complaints and select medical records from two, non-party inmates.  (Dkt. #110.) However, it is not clear what conclusions the court is meant to draw from these documents in relation to any of the defendants, other than the suggestion that others suffered deliberate indifference at the hands of HSU medical staff.  However, affirmed inmate grievances are not proxies for constitutional violations.  Moreover, the documents do not even pertain to medication delays, but rather to inconsistent wound care and treatment for gangrene.  Finally, unless tied specifically to Waterman to show state of mind or absence of mistake, such evidence is inadmissible under Federal Rule of Evidence 404(b).  For all of these reasons, the court will not consider these documents.

negligence.

In fairness, plaintiff had submitted later HSRs complaining that he was not receiving cyclobenzaprine either.  Again, however, plaintiff offers *no* evidence suggesting that these concerns ever reached Waterman herself.  For example, while plaintiff addressed a January 20, 2019, HSR to Waterman stating that he needed pain medication, the response indicates that a nurse triaged and forwarded his request directly to an advanced care provider, rather than to Waterman as an administrator.  (Dkt. #77-1 at 22.)  And while plaintiff testified at his deposition that at various points nondefendant nurses told him that they had relayed his concerns to Waterman, plaintiff was vague as to when and with whom these conversations occurred.  (Dkt. #68-1 at 97:16-99:19.)  Nor does the record contain any indication that someone spoke to *Waterman* on plaintiff's behalf about Tramadol or cyclobenzaprine, reducing such assertions to multiple layers of inadmissible hearsay and unreasonable inferences.[5]

Certainly, plaintiff had reason to be frustrated by the delay in receiving Tramadol *and* cyclobenzaprine, but Waterman's position as HSU Manager alone is not proof that she was personally aware of every HSU issue and inmate complaint.  *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) (rejecting concept of supervisory strict liability under § 1983).  Without evidence that Waterman *knew* about plaintiff's ongoing difficulty in obtaining pain medication after his first visit with Dr. Gavin, a reasonable jury could not

---

[5] Among the many exhibits submitted by plaintiff is a one-page, behavioral log, which notes that he had complained about his pain medication to security staff on January 6 and 28, and on February 8 and 18, 2019.  (Dkt. #6-1 at 49.)  However, Waterman is not referenced in any of the corresponding log entries.

conclude that she recklessly disregarded a serious risk of harm to plaintiff.  Waterman is therefore entitled to summary judgment in her favor on this claim.

### C. WSPF Nurse Practitioner Sandra McArdle

As for Nurse Practitioner McArdle, plaintiff alleges that she failed to respond adequately to his complaints about pain and delay in restarting his Tramadol prescription.  Unfortunately, even when viewed in a light most favorable to plaintiff, the record shows otherwise.  First, while McArdle approved plaintiff's renewal request for Tramadol on December 19, 2018, the record shows that she was *not* responsible for filling prescriptions or delivering medication to inmates, *and* she did not learn plaintiff was without the medication until a nurse forwarded plaintiff's December 30 HSR about the problem to her.  Second, the record further established that when she did find out, McArdle did *not* ignore plaintiff's concerns.  Far from it, she investigated by contacting the pharmacy, speaking to HSU staff, and reviewing plaintiff's medical records, and upon realizing that plaintiff's request for Tramadol had to be approved by the Class III Committee, it was McArdle who promptly drafted a patient letter to plaintiff, both documenting what she had learned and noting the difficulty in obtaining the necessary permission to restart his Tramadol prescription.  McArdle also requested that plaintiff then be evaluated -- a precursory step to committee evaluation -- and ensured that he had other pain and sleep medication available to him in the meantime.

Third, although plaintiff testified at his deposition that he would not have taken certain other, prescribed medications, and had been informally complaining to HSU and security staff about his Tramadol, plaintiff offers no evidence that *McArdle* was aware of

Case: 3:19-cv-00595-wmc   Document #: 124   Filed: 03/11/22   Page 22 of 26

either fact when she looked into his HSR.  Finally, and fourth, plaintiff offers no evidence from which a reasonable jury could infer that McArdle understood circumstances had changed a few days later on January 9, 2019, when plaintiff alleges that he approached McArdle in the HSU about his pain, and she advised him to file a formal request via HSR. Most importantly, McArdle would still have been unable to prescribe Tramadol without committee approval, and she knew that plaintiff was scheduled to be evaluated and had other sleep and pain medications available to him.  Moreover, plaintiff does not allege that he was in obvious pain or acute distress when speaking to McArdle.  (Dkt. #105 at 8.)

To the extent that McArdle could be found negligent at that or any other point for not attempting to expedite plaintiff's evaluation, assuming she could, "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough—the prison officials' state of mind must rise to the level of deliberate indifference." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020); *see also Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners.").  Again, plaintiff was understandably frustrated by the circumstances in general and by McArdle's response in particular, but a reasonable jury has no basis on this record to find that McArdle consciously *disregarded* a serious medical need of plaintiff.

### D. Dr. Gavin

On January 18, 2019, plaintiff also saw Dr. Eileen Gavin, who plaintiff argues was deliberately indifferent in failing to seek the *immediate* restart of his Tramadol prescription, thus playing a hand in its delay.  However, evidence at summary judgment shows that Dr.

Gavin exercised medical judgment in various ways, and she did *not* delay or withhold prescribed pain medication as a "gratuitous cruelty." *Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002). Indeed, there is no dispute that Dr. Gavin performed a thorough examination of plaintiff at their first appointment and heard his pain complaint. Although Dr. Gavin did not yet have plaintiff's most recent MRI available to confirm the extent of his chronic shoulder injury, she also observed, correctly or not, that Yerks did not appear to be in acute distress. Moreover, Dr. Gavin did not leave plaintiff without options. Rather, she prescribed plaintiff a three-week trial of cyclobenzaprine, which (unlike Tramadol that took Class III Committee approval) Yerks could begin immediately. After noting a significant muscle spasm in his trapezius, Dr. Gavin also concluded that plaintiff might benefit more from cyclobenzaprine as a muscle relaxant than from continued Tramadol use. Finally, Dr. Gavin assured Yerks that he could resume Tramadol if the short trial of cyclobenzaprine proved ineffective and scheduled him for a follow-up appointment.

The Seventh Circuit has explained that "treating pain allows considerable room for professional judgment." *Norwood v. Gosh*, 723 F. App'x 357, 365 (7th Cir. 2018); *see also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (stating that "[u]sing [pain killers] entails risks that doctors must consider in light of the benefits."). To the extent plaintiff may have disagreed with Dr. Gavin's initial approach, he was not entitled to the specific medical treatment of his choice. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Nor is a "mere disagreement with a doctor's medical judgment," even amounting to medical malpractice, "enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Unfortunately, Dr. Gavin's prescription for cyclobenzaprine was not filled for whatever reason, but plaintiff offers no evidence from which a reasonable jury could find that she should have known (or even more likely than not knew) Yerks had not received this medication until Yerks himself told her at his appointment on February 18, 2019. Instead, between these January and February appointments, the evidence shows plaintiff submitted two HSRs, both asking for pain medication, including cyclobenzaprine, and while the latter HSR was apparently forwarded to "the prescriber" on or about February 12, plaintiff offers no evidence that Dr. Gavin or some other advanced care provider would have received it in the ordinary course, much less received it before February 18 when they met in person.   Regardless, to the extent Dr. Gavin was arguably negligent or grossly negligent in tracking any HSRs forwarded to her, it still would not be proof of deliberate indifference.  *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("without evidence that defendants acted with the requisite bad intent in delaying the dispensation of his medication, Burton's allegations are insufficient to sustain a deliberate indifference claim"); *Robbins v. Waupun Correctional Institution*, No. 16-cv-1128, 2016 WL 5921822, at *3 (E.D. Wis. Oct. 11, 2016) ("isolated mistake does not allow a plausible inference of deliberate indifference").

Finally, there is *no* dispute that Dr. Gavin took quick action on February 18, 2019, after learning that plaintiff had not yet received cyclobenzaprine, undermining any reasonable inference that she would have responded differently had she been made aware of plaintiff's failure to have the prescription filled earlier.  Indeed, Dr. Gavin actually immediately ensured that the medication was available *and* provided to plaintiff that same

day.  Also that same day, having reviewed plaintiff's MRI results, Dr. Gavin completed an authorization for chronic opioid use in preparation for presenting plaintiff's need to the Class III Committee.[6]

"[T]he infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Downey*, 805 F.3d at 785 (citation omitted).  Taken together, the evidence of plaintiff's care precludes a reasonable jury from finding that Dr. Gavin or any other defendant deliberately or recklessly disregarded plaintiff's serious medical needs.

## II.  Wisconsin negligence and medical malpractice claims

That leaves plaintiff's Wisconsin state law negligence and medical malpractice claims.  The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial.  28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefson*, 807 F.3d 239, 252 (7th Cir. 2015); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499-501 (7th Cir. 1999) ("[I]t is well established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  In keeping with that rule, the court will decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims, state no opinion as to

---

[6] While plaintiff maintains that Dr. Gavin originally advised him that she would present his case in late February, she ultimately appeared before the committee on the March 13 meeting.  To the extent plaintiff believes Dr. Gavin *should* have presented his case to the committee sooner as originally stated, there is no evidence that there *was* an earlier committee meeting which Dr. Gavin could have attended.  What the record does reflect is that as of March 13, 2019, the same day the committee met, Dr. Gavin had ensured plaintiff got access to a variable Tramadol dose twice a day, allowing him to tailor the appropriate dosage based on his pain level in the moment.

their merits, and dismiss them without prejudice.  Subject to the applicable statute of limitations, which this lawsuit likely tolled, plaintiff may still pursue those claims in state court, but should not stand on those claims, if any.

That said, the court is troubled that plaintiff's longstanding Tramadol prescription was abruptly discontinued without explanation, and then a substitute medication also delayed without explanation.  If nothing else, these delays suggest a lack of proper procedures in place at WSPF to track pain prescriptions orders and HSRs.  For the reasons stated above, however, the court must grant these specific defendants' motions for summary judgment.

## ORDER

IT IS ORDERED that:

1) Defendants' motions for summary judgment (dkt. ##65, 71, 80) are GRANTED as to all federal constitutional claims and DENIED as to all remaining state law claims.

2) The clerk's office is directed to enter judgment in defendants' favor on all federal claims and DISMISS WITHOUT PREJUDICE all state law claims and close this case.

Entered this 11th day of March, 2022.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

26